The next case is Randy Martin Mholland. I'm sorry, yes, Kurtz and Kurtz v. Mr. Wolpert. Good morning, Your Honors. Good morning. Or good afternoon, I guess I should say now. And at this time I'd like to reserve one minute. Surely. Your Honors clearly are familiar with these cases. We know the facts in this matter. And so there are two separate claims in this case. There is a claim for Randy Mholland, but there is a claim for Christine Kurtz. The two claims overlap, but they are analytically distinct. And we are appealing the district court's grant of the Rule 50 motion because we believe that the court got it wrong in connection with Randy Mholland's claim. It did not weigh the evidence correctly and allow the claim to go forward. But even more significantly, and in order to show our case in its clearest light, the court did not analyze Christine Kurtz's rights at all. Any analysis of her rights or the deprivation of her constitutional interests is glaringly absent from the trial court's opinion. How, if the trial court, the district court was correct, take that as a, I know you just can't figure this, if the district court was correct in analyzing, as it did, the claims that were put forward about the report of the proceedings, is there a claim, even if the court didn't mention Ms. Kurtz separately, is there any basis for her to recover? Yes, well, because we would not agree that her, the court analyzed her substantive due process rights, and they were, those were her eight, her children, two children by Randy Mholland, her nieces and nephews, her grandchild, and in fact a sick child by Brenda Hetty. They were taken from her home. She was a co-parent to these. So that act cannot be overlooked. It's the glaring event in this case. But what if the court was correct on the reasonable suspicion because of the allegations of abuse? I don't, I don't think that the court ever really reached a conclusion on reasonable suspicion. Rather, it went through an analysis of Randy Mholland's claims and then really the court came down and said the court will not address the constitutionality of BCCYS's other conduct because plaintiffs have not established a necessary link to an official policy or custom. It never actually confronted the Croft standard, which is if you seize eight children from someone's home, you ought to have a reasonable suspicion that there's a child at imminent danger of abuse. There were three investigations in this case. We pointed them, we introduced them in 03, 05, and in 06, and in fact the one in 06 was the preceding Saturday, which all came to the exact opposite conclusion. There was no danger to any child. The children were well taken care of. One of the investigators, the one in November of 05, Susan Santos, was one of those case workers who then, under the direction of her superiors at CYS, filed some of the petitions, but not all, to remove the children. So there was no possible way to square up the Croft standard with the court's analysis because the court does not. It just says, well, if Randy Mholland is on child line, and that child line dates from 1996, and if that listing is not constitutionally infirm, then it's okay to take eight children in 2006. Is it the case that, is it your legal position that the county could not rely, could not Yes, it is. And it is clearly because Croft says, just as in Croft, you can't rely on a hearsay report from somebody who says, well, I heard from so-and-so that a child's walking around without clothes on. In this case, not only was that child line listing ten years old, and of course we argued vigorously that it's infirm, but there was an investigation. The investigation went to the exact opposite result. The children are safe and well in November of 2005. This home was repeatedly visited by county workers because Brenda Heddy's children, and I want to talk about Brenda Heddy. But does the record show that those, quote, investigations evaluated Mr. Mholland? No. No, it did not. Those investigations pertained to different kind of children and circumstances. One of them did because it involved an interaction between Mr. Mholland and his son Nathan. The one in 05, Susan Santos in November of 05. That one did. The one in 03 pertained to Brenda Heddy's children, and then the one in 06 pertained to S.G. Savannah. So they had no reason to look at whether Mr. Mholland was an appropriate person to supervise children. Well, I would argue that they certainly did when they investigated his interaction with Nathan in 05, but even if that were true, Your Honor, that they had no reason to look, under the Cross standard, they can't say, well, we haven't gotten around to looking, so we'll take the children. Well, here's the interesting thing about the approach you're taking. It sounds like what you're saying is, and again, I understand that this is not your view or the view of your clients of the facts, but if we were to speak hypothetically, it sounds like the legal pitch you're making is, if an investigation fails to identify a problem that actually did exist, then the state or the county is somehow foreclosed, once they become aware of that problem, from relying on that at a later point in time. Well, I think the use of the word problem is ambiguous in your question, Judge Jordan. Well, take a hypothetical where you've got, it's not your client, it's Mr. X, he's founded or he's implicated, either one, and so he's on the child line report because he molested somebody, okay? And through ineptitude or some problem, there are later investigations in the home that don't uncover that, but when it is uncovered, the state or the county wants to rely on it, chooses to rely on it. It sounds like you're saying they can't do that, because if in the intervening time there haven't been other problems, the county or state is not permitted to go back and say, found it, implicated, therefore it can't. That's correct. It is not. And here's the reason why. A mere listing on child line, standing alone, actually whether it was three weeks old or ten years old, as the one was in this case, does not by itself warrant seizing children from a home. The standard was set by Croft and the standard is set forth in Pennsylvania Code. There has to be some reasonable suspicion of danger to a child. The child that was involved in the incident in 1996 is 23 years old. She's testified in four different ways that nothing ever happened, which is why the child line listing was ultimately removed. But even if that hadn't happened or even if the CYS didn't know about that, they cannot rely on that ten-year-old listing and say, hence we may now take children. They may not, because there is no imminent danger to any child, nor does their petition recite imminent danger to any child. Your own child line, we take your children, simply is not the law. Croft says it's not the law, and it's not the law anywhere. It fails utterly under ordinary Fourth Amendment jurors. But don't you still have to meet the shock the conscience test? Yes, we do. And we submit that we did. When eight children were taken from this home, it shocks the conscience. It shocks the conscience when after three investigations where the home was cleared, where Randy Mulholland and Christine Kirch were cleared, and they appear in court that morning. There was something genuinely conscience shocking. These people are in court that very morning, not as defendants as plaintiffs to rescue Savannah from a bad situation. They are petitioning. Christine Kirch, she gets the court order. There is a gathering of CYS. Did the record show how this petition was precipitated? Yes, it does, Your Honor. There is testimony in the court. Basically, to briefly recapitulate, their son, Irvin Green, and the mother of Savannah, Ronnie Fisher, were abusing alcohol and drugs. Savannah was staying much of the time with Randy Mulholland and Christine Kirch anyway. They were taking care of the child as grandparents. When they saw the situation deteriorate to the point that Savannah was in danger, they took Savannah and said, we're not giving Savannah back to you. Irvin Green, the father, got very upset and called the Reading police, said, my child has been kidnapped. Of course, the police got involved and said, you ought to call CYS. Christine Kirch then said, Randy, call CYS. We want to have custody of Savannah. We need to take care of her. Christine Kirch has been a caregiver, not only for Savannah, but again, I keep wanting to go back to this, all of the heavy children. She has been the mainstay and the rock for all of these children. But that's how they got those children. How did the petition occur to take the children away? They went into court. Mr. Oakes, their attorney, filed a petition. Christine Kirch was the petitioner. An emergency petition, which was presented to the Court of Common Pleas of Berks County, Judge Lash, and Juvenile Court on that very morning. They copied CYS on their petition. Not copied formally, because they weren't a party, and there's no doubt that they were not a party, but they got a copy of it. So the testimony in court was there were between six and nine CYS workers in that court, supervisors and employees. They didn't know them at the time, but subsequently, they got to know them, and it was Marcia Gantner, Judy Hoover, Shelly Sherman, all supervisors, Kelly McGarrel, Susan Santos, and Tina Daniel, all CASE workers. They were all there, at least, and others. Then that night, without any warning or contact, without any time to discuss it with Randy Mulholland or Christine Kirch, they appear with police cars, the Reading police. And I do want to address this issue of not showing enough evidence that the county itself is responsible, the Monell problem. My clients were never angry, really, at Tina Daniels or Susan Santos, even though those are the two CASE workers that filed the petitions. They knew that they were taking orders from others. It was self-evident. How do we know that there was a conspiracy in 9-11? Because different terrorist groups acted in concert. It was coordinated activity. Tina Daniels and Susan Santos filed their petitions in the Court of Common Pleas that afternoon at 204-C-06, 205-C-06, and 206-C-06 to remove these groups of children from three mothers, Christine Kirch, Ronnie Fisher, and Brenda Hetty. So they were acting in concert clearly under the direction of their supervisors. George Cavari testified. He's the executive director. He said, yes, we only file these removal petitions when three supervisors agree. Well, sort of implicit in what you're arguing here is that because a supervisor was involved that that means that there was a custom or policy to not do an adequate investigation. Does that really follow logically? No, that's not quite our position. Our position is that when three supervisors agree, because they are delegated that responsibility by the executive director, George Cavari, then that is an official act of the agency. We need look no further. There is no greater policy maker. But is that a custom or a policy if it's a singular act? It can be, Your Honor, but I would rather point to another case where I think this was addressed by this court, and that's the McGreevey case. It's cited in our brief, and it's McGreevey v. Straff in 2005. In that case, a schoolteacher claimed that her, was given a bad review for retaliatory reason. And this court said, well, and the Minnell problem arose. Why are you screwing the school district? And this court said, well, it was actually the superintendent that had the responsibility for writing reviews. It wasn't a removal. The school board would have been. And the superintendent delegated that responsibility to the principal. So once delegated, the principal giving a review for a retaliatory purpose because she was, they thought she was the left house, that was a Minnell act. That got us to Minnell liability. Well, it sort of feels a little bit like you put the rabbit in the hat there when you said delegated it and a review was undertaken for retaliatory purposes here. Here, probably nobody is happy with how the thing played out. Certainly your clients have ample reason to have felt that the system broke down in the way things occurred on that Saturday. But the fact, that fact alone, that the system didn't operate the way it was supposed to, how does that become a customer policy for bad actions by, or insufficiently investigated actions by the people at the county? An excellent question. Because the term customer policy in this court and many others has become a flexible, fungible, plastic term that really is subject to the close, careful analysis on the facts. When I sat down to read all these cases about customer policy and started to try and draw a line and said, okay, here's Minnell liability on this side and here's a no responding at superior. We agree, there's no responding at superior liability. There was no logical way to draw that line except by looking very closely at each set of facts and the term customer policy became a kind of code word almost, certainly a very broad term that was shaped to the individual facts of the circumstances. But where you have conduct that clearly fails to meet the cross standard and conduct that clearly is approved by authority, we think that that is an act of the policy maker. And I want to draw your attention... I guess I'm still having trouble trying to figure out, what do you say, I know that you say taking the children from the home was the conduct that shocks the conscious. Okay. Where was the policy that Berks County followed, or failed to follow, that led to the act of Where was their mistake here? Well, the mistake was not meeting the cross standard, to answer that part. To answer the policy part, the act of deciding whether to remove children from the home is an act of judgment that is committed to the agency, not the county, but the code commits it to the agency. And there is no one rule or policy, whether somebody's on the child line or not. It is a decision that's made at the time on the facts. Okay, but you had a lot of facts, but two facts that you continued to have in the record was the 1996 finding of indicated, okay, and the petition for protection from abuse. But, well, their testimony was they never relied on the petition for protection from abuse. Their petition did not recite that, but... Certainly there was a finding... There's not a connection. That's the logical error that we're trying to raise to this court's attention. I know you are, but I want you to tell me how, with that fact in existence, their conduct shocked the conscience. Because it doesn't meet the Croft standard, because a child line listing does not lead to having children taken away from the home. Does every mistake of law then turn into something... Certainly it's absolutely and terribly distressing for your clients. I don't want them to think, or anybody else to think, that there's a lack of sensitivity to the personal anguish of the events of that day. But to shock the conscience doesn't take something more than the county workers were wrong. It doesn't have to be something more dramatic in the sense of they were actively trying to do something to damage the rights and interests of their clients. It can't be enough just to be mistaken about the law. Well, Berg, I thought, was a case that we would rely on to address that. And in the Berg case, there was a warrant that was mistakenly issued by a software system. And this court held first, notwithstanding that there was no written policy, having a software system that issues 6,000 warrants a year is going to be attributed back to the municipality. And then the mere fact that there was a reckless or negligent, whatever adjective is used, act which led to a false arrest. And the individual, he was arrested in front of his friends and put in jail for five days. This court found that shocking. And finally, I know I'm out of time. I just want to ask the court to consider the application of Moore versus the city of Cleveland in terms of the rights that Christine Kurtz had with her nieces and nephews, Brenda Heddy's children, because the district court overlooked that altogether. Good. Thank you very much, Mr. Wilk. Mr. Connell. Good afternoon. Good afternoon. May it please the court. Matthew Connell here on behalf of Berks County. One of the things I asked this court to keep in mind as it ponders this case is, this case was dismissed on Rule 50. The reason the Rule 50 was granted is because there was no evidence introduced during trial to support the Monell claim. This is strictly a Monell claim. There are no claims against any individual defendants. So therefore, the plaintiffs are left with the need to prove that their constitutional rights were violated as a result of a municipal policy, practice, custom, or procedure. Was it a policy of the county that the BCCYS would not inform Childline when there was exculpatory material? That's what the testimony, Your Honor, was. And that's with regards to the CY49. Sure. Is that a custom or policy that in some form or fashion contributed to what happened on that very sorry Saturday? Your Honor, I would suggest it does not. And I would also like to discuss what you termed as the very sorry Saturday, kind of in a rebuttal. But I'll answer your question with regards to CY49 first. There's no evidence that a CY49 is used to present Childline with exculpatory evidence. That is purely an argument that's been made by plaintiffs during trial and here on appeal. There's no evidence to support that. They did not introduce any testimony from any witness that a CY49 is used for the purposes of providing exculpatory evidence. In fact, the only evidence they did present is when they presented Brandy Niter, the now Director of Intake Services of Berks County, on the issue. And when she was asked questions on the issue, and she was cross-examined on the issue, and her testimony was that's not what it is used for. It is used to provide additional information with regards to the outcome of the criminal charges when they have that information available to them, or other sort of administrative information, such as Social Security numbers, names, witnesses, things like that. Is there another obligation to report that? Pardon, Your Honor? Is there another obligation that is other than that particular form? Why does the county have an obligation to report something that might be exculpatory to Childline? Why do they have an obligation? Why do they not? Why do they not? They have an appeal process. That DPW runs? That's correct. That the individual who was placed on Childline has the right to file an appeal to present any evidence that they feel is exculpatory. And let's also keep in mind with the exculpatory evidence that the plaintiffs present here, it is the plaintiff's own denial of the 1996 incident, which flew in the face of the two protection from abuse petitions filed by the co-plaintiff, Ms. Kurtz. Well, it's not just his denial. I mean, there is evidence in the record that the victim herself later repeatedly denied it. Now, I'm not getting into whether, you know, you believe or you don't believe or whatever, but there's evidently repeated statements by her that nothing happened. In fact, she says, I don't even remember talking to anybody about it. But if something like that comes out, the victim later recanting, is there a responsibility of the county to make that known to the Childline folks? I think that we need to focus on the facts of this case, Your Honor. I am not aware of any case where there is a recantation that puts an express burden on a county agency to provide that information to Childline. One of the reasons are, and there was testimony of this in the record from Ms. Niter, and Judge Schiller cited an opinion that talks about recantation and its unreliability for various reasons. Under these circumstances, you mentioned that there were a couple of different recantations. It only occurred once before Mr. Mulholland filed his appeal. That was in 1998. And it was during a time where the victim, who was living with her grandmother in Texas, ran away to Redding and she was taken to CYS. During the initial interview, the victim said, I want to live with my dad. And the caseworker said, you can't because there's issues. And she recanted at that time. It's a classic case of recantation in order for the victim to get what they want at the moment. So the way the state system is set up, as I understand it, is the burden falls on the person who is listed to go and file the appeal, not on the county. That is correct. So then the response, I guess, from the plaintiffs here would be, yeah, but nobody ever even told me I was on the list, so how could I possibly resolve the problem? You're putting me in a damned-if-you-do, damned-if-you-don't thing. Nobody tells me, so I can't appeal. And then later when these recantations come to light and other evidence that I'm not responsible, you know, leaving aside credibility issues, I'm told, well, we didn't have any responsibility and you never came to us. We didn't tell you and you never came to us. What's the argument back there? First, again, keeping it in the view of this case, Mr. Mulholland alleged that he never received notice of being placed on the child line, and that was part of Judge Shiller's analysis in dismissing the case. Our response to that is, A, that is not the county's responsibility. Under the Child Protective Services Law. That takes it on itself to do that, though, right? Isn't the county? The county does issue notice, and I would suggest, Your Honor, that that does not provide grounds for Monell liability or any constitutional liability. The county issues notice that they sent the information to Childline. That is correct, and that's a key point because when Childline places an individual on Childline, if you will, DPW places an individual on the child line registry, they issue the notice at that point, and that's a key point because that is when the appeal period runs. Was there any testimony at the trial? Of course, it was only the case in chief that was presented, but was there any testimony about how Childline operates? There may have been some rudimentary testimony from Ms. Snyder about the fact of placing somebody on Childline and the notices going out. Yes, that was presented through Ms. Snyder, and it was established that it is Childline who issues the notice. Okay. Was there any testimony as to it being unusual or typical that notices don't get sent out by Childline? Ms. Snyder testified that this is the first time in over 750 investigations that she was involved in that she ever heard of somebody coming back and saying they never received a notice. So there is that evidence on the record with regards to history of Childline's. Am I correct that DPW has to notify and give the person so notified the opportunity to explain? An opportunity to explain. To explain why, to contest it? Their first level is they can go to DPW and say this isn't. No, but is the person that's so indicated, is that person advised that they can contest it? That's part of the notice, yes. If I may address what Your Honor referred to as, or even before what Your Honor referred to as the unfortunate Saturday, in the argument there was a lot of reference to the Monell problem by counsel for plaintiffs. And I would suggest if you look at this record in its total, he recognizes today that there is no such thing as responding as superior against municipal liability for a violation of someone's constitutional rights. I think the record reflects that that recognition didn't come during trial. There is no evidence presented, there was not even an effort to present Monell type evidence, evidence of prior similar conduct, evidence of faulty practices or procedures. And it seems to me that that is an argument that is being put out on appeal, but with the bottom line being that the evidence wasn't presented during the trial, which is why the Rule 50 motion was granted, because there was no evidence to support that claim. A lot of the suggestions... Hold on just for a second there. You say there was no evidence to support that claim. There was, as I understood, there was testimony that they put on of the events that occurred on the Saturday and of the things that had happened from 96 Board. And then an effort to argue based on that evidence, as we heard from the opposing counsel today, that the fact that those things happened showed a sanction by the county, that they couldn't have happened without the sanction of the county, so that that represents in some form or fashion the act of the county, because it was delegated authority. They acted on that delegated authority in this bad way. That's the argument they're making today. And the evidence that's in the record is the evidence they're relying on. What's wrong with the legal argument that the act, that the delegated authority and the actions that they took based on their delegated authority represents the official customer policy of the county? There's just no evidence that a policymaker, the legal folly of that argument is that you need to have, even under the McGreevy case, which he cites through here, the McGreevy case very expressly says in order for a single act monel liability to attach, it must be an act of a policymaker. And that evidence was not presented. There was no evidence that there was a policymaker that said, go and do this on the Saturday. And that's what would be necessary, even to try and establish the very basic minimum of monel, that is have a policymaker make a decision that can be attributable to the county. That wasn't presented here. What does it do with the argument that they made, that you had multiple people taking actions at the same time, so somebody above them at the policymaking level had to have been involved? What about that? I'm not sure I understand the multiple people doing things at multiple times. And that goes to the part where I think I wanted to try and rebut a little bit. The suggestion that, and I think it was Judge Fischer who questioned counsel on the issue, when these folks from the Children and Youth Services agencies go out to homes, they have their files set up in certain ways. And I believe there's evidence in the record that says it's set up under the mother's name. As counsel suggested, there were several different families living under this work. All families had contact with Children and Youth Services. If a Children and Youth Service agent goes out to a house under one family, they have that file at best. So they don't know who the other people are. The 1996 incident that placed Mr. Mulholland on child line, he refers to it as stale or old. Well, the fact is, in 2006, he was still on child line. That was not removed until several years later. So he was still on child line. That's why it is explainable. And, of course, we didn't get to it in our defense. We were prepared to present this evidence, but the judge properly granted the Rule 50. What happened was we would have presented evidence that said people go out there, but they don't have all the information on all the people that are present. Even if somebody says, hey, I'm Randy Mulholland. It's a stretch that every Children and Youth Service worker in Berks County would know who Randy Mulholland was and that he's on child line. So that's explainable. In other words, it's not like, I don't know if you were here real early today and you heard the 9 o'clock argument. It's not like a SORNA registration that you could specifically look at that home and say how many people do we have registered on child line who may be in this facility. It would be impossible. If Randy Mulholland moved to Pittsburgh and started living in a home with children in Pittsburgh, the Pittsburgh Children and Youth Services agency could possibly know that that Randy Mulholland is on child line. It usually takes a triggering event, such as what happened in the courtroom that led to what Your Honor referred to as the unfortunate sir. What happened in that courtroom was Ms. Kurtz filed a petition against her son to obtain custody of her son's child. Berks County was not a party to that action. There happened to be a group of caseworkers in the back of the room at the time. They were not at a party in that action. They could not have stood up, walked up to the bar of the court and said, whoa, whoa, whoa, this can't happen. That was between two private parties. So what happens after that? Berks County Children's sees that in the petition filed by Ms. Kurtz, and I think it's telling that Randy Mulholland didn't join in the petition, but in the petition Ms. Kurtz says, I now live again with Randy Mulholland. They had been living separately for over 10 years. So there was no reason for the county to believe that Randy Mulholland was living with the children. They see in the petition that he is now living with children again, not only children, but many children, many children, some of whom don't belong to him and Ms. Kurtz. They go back and pull the file and say, isn't he on child line? They look at the records, they see he's on child line, and they say, now we know, based upon the petition and the judge granting the order for the grandchild, Children's Services looks at it and then realizes that that's a potentially dangerous situation. They go and they petition. Do they have any obligation to look into it further? I think that may underlie a lot of the emotion in a case like this, is that somebody in an office somewhere finds a piece of paper and then shows up at your door with a platoon of police and takes children out of the home. Is it the county's position that it wouldn't have maybe been a good idea to talk to people first? That's my reference to Unfortunate Saturday. I mean, this might have a whole different tenor to it, and we wouldn't maybe even be sitting here if somebody walked out to the home and said, hey, this is potentially problematic. Is that something that the county doesn't do or thinks is a bad idea? Well, I don't think that there's evidence presented as to what those issues are. But what I would suggest to Your Honor is, A, they followed the letter of the law, both the Child Protective Services law and statute regarding taking children into custody. They didn't act alone. They didn't just walk in and take the kids out. They petitioned to court. They presented that information to the court. It was a court order, one that was never overturned, by the way. Okay? So I would even suggest, although we didn't say it in our brief and I apologize, Rooker-Feldman could play a part here and preclude that argument. That's not an issue before us. Okay. Well, they go to the court and petition the court to have an order issued. They execute that order. Now, that order allows Children's Services to remove the children temporarily, and that's in the Child Protective Services law, temporarily. There must be a hearing within 72 hours. There's no claim here that that hearing wasn't provided. In fact, after that hearing, some of the children did go back. Okay? So does it always work out perfectly? If they did that, if they only went and talked, instead of they sent a caseworker out to talk to them, what are they going to do then? Just say, oh, okay, everything's fine? The fact is he's still on top. Maybe things would have developed in the same fashion, or maybe not. I guess that's counterfactual, and we won't ever know the answer to that. But it developed the way it developed, and we understand the position that the county's got. Okay. Good. Thank you very much. Thank you. Good. Yes, Mr. Wofford. Just to reiterate, Christine Kars was not on trial. Christine Kars lost her children, her nieces, her nephews, and her grandchildren. Yeah, I'm struggling with why you think that if you accepted everything that the district court did after hearing evidence as true, that this was, that Mr. Mulholland was in the home, he was on child line, he was an indicated person, he wasn't allowed to have contact, all that being the case, they go, they get a court order to make sure that the children are not in the home with Mr. Mulholland. What is shocking to the conscience about this case suffering some of the fallout of that? It's not a happy circumstance, but what's shocking to the conscience about the county with a court order going and removing children from a home where somebody who's indicated on child line is living? Two things. First, even being indicated on child line doesn't mean there's a child in imminent danger. The code requires it. Second, because the obvious result, and Croft is a good example, you would go ask Randy Mulholland to leave. Why not go to the house and say, listen, Randy Mulholland's on child line, we have a problem with it, would you please leave? Which is what, the circumstances were almost perverse in the sense that for whatever reason, CYS decided that Christine Kurtz and Brenda Hennighad But you're asking them to follow a policy that would be impossible for Berks County CYS to repeat in the many other cases they have in any given time at a county. I mean, you're essentially saying, all right, they found out that Randy Mulholland was living in this house where these children were. Because of their knowledge of the 1996 reports, they filed the petition, the court said, signed the order, they said go and remove the children. You're basically saying they should have done something else. And I'm not sure what it is that something else is that makes sense under the law. Yes, I'm asking that they do the investigation that Croft requires that there is a child. What would have it shown? What would have that investigation shown? It would have shown, well, it may have shown what it showed in 2003, 05, and 06, where Randy Mulholland and Christine Kurtz were living together. Mr. Connell said it's likely that at those times, there was no knowledge that Mr. Mulholland was even in the house. And you acknowledged that earlier in your initial argument. I ask you, did they target Mulholland? Oh, but he was in the house. Maybe we're talking about, did they target Mr. Mulholland as to that issue? No, but did they know he was in the house? They sure did. Oh, okay, because he was there. Every time they talked to responsible adults in the house, he was there. They wrote his name down on their reports, and they said, we talked to him. And the other point I want to just end with is, if we were wrong about Monell liability, if we should have brought this against the individual so that we might have this qualified immunity argument, the three supervisors who really made the decisions here are anonymous. Not at our behest. It's CYS that did not document who these people were, nor did people recollect who they were. If we were to seek prospective relief against a repeat of this activity, we would, of necessity, have to make the defendant respond in CYS. We can't find or know who these supervisors are. To the extent that that's lost, we, as plaintiffs, should not bear the burden of it. They are responsible for documenting. And in some cases, they did document who was on a petition review committee, but not for the events that happened here. Good. Thank you. Thank you, Mr. Welpert. Thank you, Mr. Connell. The case was well argued. We'll take the matter under advisement.